UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHARLES DELAUGHTER,

     Plaintiff,

v.                                Case No: 6:22-cv-2370-JSS-DCI

VERIZON COMMUNICATIONS,
INC.,

     Defendant.
_____/

## **ORDER**

Defendant, Verizon Communications, Inc., moves for summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Dkt. 32.)  Plaintiff, Charles DeLaughter, opposes the Motion.  (Dkt. 41.)  Defendant also moves to strike as inadmissible certain evidence and statements from Plaintiff's response to the summary judgment motion.  (Dkt. 43.)[1]  Upon consideration, the motion to strike is denied, and the motion for summary judgment is granted.

## **BACKGROUND**

Plaintiff, an African American male, was hired by Verizon Corporate Resources Group, LLC (VCRG) in 2014 as a consultant in its financial operations department.

---

[1] Plaintiff has not responded to the motion to strike, and the deadline for responding has passed.  *See* M.D. Fla. R. 3.01(c).

(Plaintiff Deposition[2] at 36, 65–68, 114–16.)[3]   In 2018, Plaintiff applied for a senior analyst position in VCRG's payroll department, Employee Payroll Services (the "EPS team").   (*Id.* at 149–50.)   Diane Coleman, a white female and a senior manager in payroll, interviewed Plaintiff and several other candidates for the position on the EPS team.   (Dkt. 38-1 at 5.)   She selected Plaintiff and became his direct report.   (*Id.*; Plaintiff Deposition at 153.)   Lesley Harris, a supervisor on the EPS team and a black female, interviewed Plaintiff with Coleman.   (Dkt. 39-1 at 3; Dkt. 38-1 at 5.) According to a description of the new role provided in a job posting, Plaintiff's responsibilities as a senior analyst on the EPS team included supporting "payroll administrators by answering questions face-to-face[] and via group chats," "[a]udit[ing] call and email case detail[s] in Work Flow Manager," "[s]upport[ing] the supervisors with monitoring priority work queues and offline functions," and "[h]old[ing] regular meetings with payroll [subject matter experts[,] and updat[ing and ]maintain[ing] the payroll knowledge repository (Confluence)."   (Dkt. 39-1 at 13; Dkt. 49-1 at 381.)   Coleman described the EPS team "as customer service for the [p]ayroll department," the primary role of which was "answering questions from other VCRG employees about their payroll."   (Dkt. 39-1 at 3–4; *accord* Plaintiff Deposition at 392–93.)

---

[2] Plaintiff's deposition was filed across multiple docket entries.   (*See* Dkts. 34-1, 35-1, 36-1, 37-1.) Because the page and line numbers are consistent throughout, the court will cite all of Plaintiff's deposition testimony simply as "Plaintiff Deposition."
[3] While Plaintiff testified that he was hired by VCRG, he states in his response to the motion for summary judgment that he "is employed by the Defendant Verizon Communications, Inc." (Dkt. 41 at 6.)   The court addresses this issue below.   (*See infra* n.4.)

Coleman stated that, when she "got to the EPS team, it was new" and lacked a "single 'source of truth' or location or system to house FAQs [(frequently asked questions)], instructions, and information" to enable the EPS team to "provide consistent and correct answers to inquiries from VCRG employees." (Dkt. 39-1 at 4.) She stated that Miguel Reynoso, a Hispanic male, and Damali Salmon, a black female, "identified a software solution called Confluence[] to house this information." (*Id.*; *see* Dkt. 39-1 at 3.)  Plaintiff testified that he "recall[ed] being the inception and completion of Confluence," though he also testified that

> Reynoso actually sourced Confluence. . . .  [I]nitially the FAQs were going in VZK[nowledge]. . . . VZK was in a good situation.  [Plaintiff] provided [Coleman] with that information.  [Reynoso and Plaintiff] had already been meeting on finding better resources. . . .  [Reynoso] found Confluence because Confluence was in . . . a Verizon[-] approved program that the company already had. . . .  [Reynoso] trained [Plaintiff] on how to use Confluence.

(Plaintiff Deposition at 386:16–17; 389:6–14.)  According to Coleman, keeping Confluence up to date was "just one small aspect of the duties of [s]enior [a]nalysts," and "[a]ll [s]enior [a]nalysts were responsible for keeping it updated," (Dkt. 39-1 at 4), while Plaintiff testified that he believed Confluence was his project, (Plaintiff Deposition at 240).

In Plaintiff's 2019 mid-year performance review, Coleman stated that Plaintiff "[wa]s currently working on a project in which he w[ould] be improving [the] current team [FAQ]s into a searchable platform." (Dkt. 41-1 at 18.)  This statement referred to the Confluence Project, (Plaintiff Deposition at 374–75), and Coleman noted that

Plaintiff had already "spent considerable time on this project." (Dkt. 41-1 at 18.) Nevertheless, Plaintiff also received coaching regarding his performance during this review. (*Id.*) Coleman noted that Plaintiff should "set reminders to assist the team in closing out supervisor cases by the end of each business day" to "help reduce escalations and repeat calls." (*Id.*) Plaintiff testified that he "recall[ed] challenging" Coleman on this latter point "by asking for metrics." (Plaintiff Deposition at 179.) Plaintiff stated that this feedback did not account for the fact that he was being "put[] . . . on the hard cases," and that it did not align with his own evaluation of his performance. (*Id.* at 179–80.) Plaintiff testified that he was confused with this evaluation because Coleman had taken to calling him "Charles in Charge," a nickname he felt was intended to reflect "admiration" for his performance but which he found offensive. (*Id.*)

Plaintiff testified that on November 15, 2019, Coleman came to him with complaints she had received from Plaintiff's coworkers about him, which he considered baseless. (*See id.* at 183–86.) He took issue with Coleman's proposed solution: for him to go and personally speak with his coworkers to address their concerns. (*See id.*) He testified that he found this proposal particularly onerous because "[n]obody else had to do a 360"—that is, meet with their coworkers to attempt to resolve complaints raised about them. (*Id.* at 202.) While he conceded that he might have been singled out in this regard because there were only complaints raised about him, he stated that "[i]t was just humiliating for [him] to hear these claims, not know

there were claims, ask for support in the claims, not get support, and then [be] told [he] should just listen and go out and do these 360s." (*Id.*)

This meeting prompted Plaintiff to complain about Coleman to Shaheen Barrett, an associate director and vice president of human resources at VCRG, who is also a black male. (*See* Dkt. 39-1 at 53; Plaintiff Deposition at 184.) Plaintiff felt that, when he complained to Coleman, she did not "respond the way [he] thought she would respond," and that she then "negated" Plaintiff's concerns "and came with all these" complaints about Plaintiff. (*Id.* at 205.) In an email to Barrett, Plaintiff stated:

> The [p]ayroll leadership change, that included Judith Jenkins, has revealed certain individual[s'] bias toward other individuals on the [p]ayroll EPS team. In this case, I am referring to the bias that has been experienced by myself (i.e. a Black, Intellectual, Professional, and Heterosexual Male). I believe and feel that I have become a target of this bias as well as the microaggressions and other actions that accompany this bias. . . . Because this bias includes my [senior m]anager, Diane Coleman, as well as other teammates, I would like to request an in-person meeting with you and only you, to further discuss this issue, the situation, and a possible resolution.

(Dkt. 49-1 at 325.) Plaintiff testified that "all these things" were not "happening to white males or white females" or to "people who [he] consider[ed] maybe [were] not . . . intellectual," "[]professional," or "heterosexual." (Plaintiff Deposition at 206–08.)

Plaintiff requested that Barrett speak with Coleman on his behalf, specifically requesting that Barrett ask Coleman (1) why there had been no issue with Plaintiff's performance until Jenkins left, (2) why he alone was being singled out and criticized,

and (3) why he had to speak with his coworkers about their complaints against him when they "did not even inform [him] directly of any issue." (Dkt. 49-1 at 326.) Barrett stated in his declaration that he "investigated [Plaintiff]'s concerns and did not find any bias or discrimination against him by anyone at VCRG." (Dkt. 39-1 at 54.) Barrett stated that Plaintiff met with Coleman and that she "clear[ed] the air and told [Plaintiff] that she valued him." (Dkt. 49-1 at 350.)

Plaintiff testified that his "work started getting stolen" and "stripped" after Coleman gave him his end-of-year review for 2019. (Plaintiff Deposition at 218.) Plaintiff reported that this review was mostly negative, (*id.* at 219), although the review's summary section states that "[Plaintiff]'s interactions with his fellow employees [we]re extremely professional which also reflect[ed] in his attitude toward his work," and that Plaintiff "[wa]s open to feedback and [wa]s consistent in striving to improve his performance." (Dkt. 49-1 at 329.) Plaintiff challenges the following sentence from the review: "In 2019 the [EPS] team was tasked to build a robust, searchable site for our employees to easily find information related to payroll inquiries." (*Id.*; *see* Dkt. 41 at 3–4.) According to Plaintiff, this statement, which refers to the Confluence Project, is inaccurate because "it wasn't [a] team task," but was rather "[his] project" that "[he] created," and for which "[he] sought out all the support." (Plaintiff Deposition at 220; *see* Dkt. 41 at 3–4.) Plaintiff testified that this review "[wa]s where [he] . . . learned [he] was being stripped from [his] work because now [he was] being told" that he did not "do any of that"—that is, he felt that he was no longer being recognized for what he considered his accomplishments. (*Id.*) The

review did credit Plaintiff with "support[ing] th[e] initiative in finding the best tool, building it out, training[,] and rolling out to [the] team in [late 2019]," (Dkt. 49-1 at 329).

It appears that a shift in the senior analysts' responsibilities was contemplated as early as March 16, 2021, as Coleman indicated that there would be a "[c]hange in responsibilities starting A[pr]il" because Alice Castellanos was leaving.  (Dkt. 49-1 at 336; *accord* Dkt. 39-1 at 4.)  As a result of her departure, Coleman was required "to realign tasks with the remaining members of the EPS team."  (Dkt. 39-1 at 4.)  She stated that the realignment affected the entire team, including Plaintiff, who Coleman now expected "to support group chat and escalations, complete quality review forms[,] co-facilitate weekly huddles, support new hire training[,] and [perform] many other tasks."  (*Id.* at 4–5.)  As Castellanos's "backup," Plaintiff believed he would be placed in charge of her primary responsibilities, especially "systems."  (Plaintiff Deposition at 236.)  However, the responsibilities he was now expected to perform were covered by his job description.  (*See* Dkt. 49-1 at 381.)  As part of the realignment process, Coleman replaced Castellanos with a consultant, rather than a senior analyst.  (Dkt. 39-1 at 6.)  The consultant would "perform[] some of the same functions as [s]enior [a]nalysts" but would not be responsible for taking escalations.  (*Id.*)  Coleman stated in her declaration that "[a]dding the [c]onsultant role did not remove any tasks from the [s]enior [a]nalysts," and that while "the [c]onsultant would have the responsibility to ensure the Confluence updates were done," those updates would continue to be performed by the senior analysts, along with the supervisors and managers.  (*Id.*)

On March 16, 2021, Plaintiff met with Coleman to discuss Castellanos's departure and the realignment of tasks. (Dkt. 49-1 at 336–37.) While Plaintiff testified that he had little recollection as to what he discussed with Coleman, (Plaintiff Deposition at 237), it was during this meeting that he claims in his complaint Coleman "suggested that [he] should join another team within [Verizon]," (Dkt. 1 at 15). Plaintiff also testified that Coleman asked him about his career goals during the meeting. (Plaintiff Deposition at 238.) Coleman testified that she never told Plaintiff that "he needed to look for opportunities on other teams" but instead followed up with him about his "interest[] in moving to one of [the] technical teams" and offered to let him shadow another team. (Dkt. 38-1 at 6.) According to Coleman, Plaintiff turned down this offer because the team in question "work[ed] a lot of nights, a lot of weekends, [and] overnights," and he accordingly "was not interested [in the role] because of his family." (*Id.*)

Plaintiff testified that around the time of this meeting Coleman stripped him of all his duties and gave them to Katsov. (Plaintiff Deposition at 240.) He also stated that the consultant position was created simply to mask the fact that some of his critical responsibilities—especially the Confluence Project—were being stripped from him and given to Katsov. (*Id.* at 336, 406–07.) Although Coleman encouraged Plaintiff to apply for this position, he did not do so. (Dkt. 38-1 at 9; Dkt. 39-1 at 7, 55; Plaintiff Deposition at 242:3–11.)

On March 23, 2021, Plaintiff emailed Barrett to complain that he was being discriminated against on the basis of his race and gender. (Dkt. 39-1 at 63.) As

evidence, he claimed that Katsov "receive[d] more favorable treatment" than he did. (*Id.*)  He stated that this purportedly disparate treatment might also be retaliation for having previously "complained about harassment and discrimination," (*id.* at 64), referencing his 2019 complaints to Barrett about Coleman, (Plaintiff Deposition at 251).  Barrett and Plaintiff met the following day.  (*Id.* at 260.)  Barrett stated that Plaintiff could not articulate why he believed the unequal treatment he had reported was due to his race or gender.  (Dkt. 39-1 at 54.)

Barrett requested that Rupali Parikh, a human resources manager, meet with Plaintiff to discuss his claims and, specifically, why Plaintiff believed any adverse treatment he had suffered was the result of gender- or race-based discrimination.  (*Id.* at 44–45.)  Parikh spoke with Plaintiff by telephone on April 2, 2021, and Plaintiff expressed his belief that she "would not be able to understand him because he is a [b]lack man."  (*Id.* at 45.)  Plaintiff ultimately requested that Parikh "send him a written list of [her] questions so [that] he could work with his attorney to respond." (*Id.*)  Barrett followed up with Plaintiff on April 9, 2021, stating that he "need[ed] to understand the specific experiences that [Plaintiff had] been subjected to" in order to properly "address [his] concerns."  (*Id.* at 66; *see* Dkt. 49-1 at 347.)  Plaintiff told Barrett that he was "[h]oping to get information to [Barrett] by the end of the week after speaking with [c]ounsel."  (Dkt. 49-1 at 347.)  Barrett spoke with Coleman, who reiterated all of the foregoing—that the consultant position was being created as a result of Castellanos's departure and the resulting realignment of tasks among her team, that she had announced the consultant role to her team, and that she had spoken

with Plaintiff directly about his interest in the role but Plaintiff "seemed confused by the position because he felt he was doing some of the tasks" and stated "that he did not want to apply for the role." (Dkt. 39-1 at 56.)

During an April 16, 2021, meeting with Barrett, Plaintiff indicated that it was a "challenge for him" to identify the "specific experiences" that had led him to believe he was being "discriminated against and treated unfairly based on [his] race and gender." (*See* Dkt. 39-1 at 66; Dkt. 49-1 at 348.) Then, over the course of a discussion that continued into a subsequent meeting on April 19, 2021, Plaintiff went into exhaustive detail regarding what he alleged was a pattern of discrimination he had experienced since beginning with VCRG in 2014, essentially stating that he had earned the favor of several superiors that resulted in his being given increased responsibility and visibility but that these privileges were later removed from him by subsequent supervisors. (*See* Dkt. 49-1 at 348–52.) He also explained that he had taken over certain tasks for Katsov because she was "originally visually impaired," that he had done well with these, but that these roles—which he considered the "most attractive"—were later returned to Katsov, and that he had been relegated since Castellanos's departure to "backing up Lesl[ey Harris]," who, he claimed, had "previously spoke[n] about being attracted to younger men." (*Id.* at 351.)

"The summation of all of this," Plaintiff claimed, "le[d] him [to] the assessment [that] there [wa]s some racial background here contributing to his experiences" and that the "women[']s movement . . . made him feel like he [could not] do anything." (*Id.*) His complaints centered around his belief that "work [was] taken from him

[al]though he . . . perform[ed] well," while "[o]thers who [did] not perform[] well g[o]t work moved towards them." (*Id.*) Barrett subsequently met with the parties involved, including Coleman, and noted that he was "comfortable that her intentions [were not] consciously against [Plaintiff]" because the shifting responsibilities of which Plaintiff complained were the result of "[b]usiness [r]easons" and "d[id] not seem racially motivated." (*Id.* at 353.) Barrett met with Plaintiff to share his findings. (Dkt. 39-1 at 57.) Plaintiff disagreed with the findings, (Dkt. 49-1 at 353–54), and expressed a desire "to be where he would have been had he not had all of his experiences at VCRG." (Dkt. 39-1 at 57.)

The tipping point came on May 18, 2021, when, according to Plaintiff's complaint, "Coleman scheduled an impromptu meeting with . . . Plaintiff and . . . Harris," in which "[Coleman] and [Harris] appeared to join forces against . . . Plaintiff and communicated to him that his teammates, specifically . . . Harris, w[ere] uncomfortable with his interactions with the leadership team." (Dkt. 1 at 17; *see also* Plaintiff Deposition at 289.) Barrett reported that following this incident he met with Plaintiff, who "felt [that] someone from [human resources] needed to be present in every interaction [Plaintiff] had with Coleman" because Plaintiff "did not think . . . Coleman wanted him on the team." (Dkt. 39-1 at 59; *accord* Plaintiff Deposition at 293.) Plaintiff's comments gave Barrett "the impression [that Plaintiff] wanted to be off [Coleman's] team." (Dkt. 39-1 at 59.)

Barrett directed human resources representative Jen Koslik to begin looking for comparable senior analyst roles in other departments so that Plaintiff could consider

transferring.  (*Id.*)  They presented Plaintiff with one such position and, on June 1, 2021, he met with that team to discuss the role, but he ultimately concluded that "the position was not a good fit for [his] skill[]set and . . . did not align with [his] professional goals."  (Dkt. 49-1 at 368; *accord* Dkt. 39-1 at 59.)

Coleman continued to report to Barrett that she was receiving complaints about Plaintiff from his coworkers, including that he had sent rude messages to some of them, (*see* Dkt. 49-1 at 387–88), "was not taking escalations for team members, was taking extended breaks and lunches[,] and was having other performance issues," (Dkt. 39-1 at 59).  Plaintiff later spoke with Barrett again, this time referencing a GIF that Coleman had sent to her whole team.  (*See* Dkt. 49-1 at 357.)  In Plaintiff's words, the GIF depicted a "black guy dancing at work while . . . white women applaud and cheer him on," which he found "offensive to black males."  (Dkt. 49-1 at 359, 364.)  Coleman stated to the contrary that she believed the image simply showed a "[b]lack male . . . standing and appear[ing] to rejoice that it was Friday" alongside "four other employees of various backgrounds also dressed professional[ly] and also appear[ing] excited it was Friday."  (Dkt. 39-1 at 9.)  Barrett responded that he did not find the GIF offensive, prompting Plaintiff to wonder how Plaintiff could "establish a true brand if this [wa]s how that white person [(Coleman)] already view[ed] [him]."  (Dkt. 49-1 at 362.)

Barrett arranged for Plaintiff to meet with Shawn Bryant, Coleman's supervisor and a black male, to address Plaintiff's concerns about Coleman and to see whether "Bryant could provide mentorship to [Plaintiff]."  (Dkt. 39-1 at 60.)  Bryant and

Plaintiff met on June 22, 2021, "and largely discussed Plaintiff's complaints about the GIF." (Dkt. 33 ¶ 27.)  Following the meeting, Bryant emailed Barrett and Koslik, reporting that Plaintiff "state[d] that he did not believe he could continue to work with [Coleman]." (Dkt. 39-1 at 70.)  According to Plaintiff, however, he told Bryant that he could "work with anybody," but Coleman did not "want to work with [him]." (Plaintiff Deposition at 302.)  The parties stipulated that Bryant reported "to [human resources] that Plaintiff could not work with Coleman," and that Plaintiff "demand[ed] that someone in [human resources] be present in every interaction with Coleman." (Dkt. 33 ¶ 30; *see* Dkt. 39-1 at 60.)  Accordingly, VCRG's human resources department renewed its efforts to "look[] for lateral positions within [p]ayroll for Plaintiff." (Dkt. 33 ¶ 30.)

According to Coleman and Harris, Plaintiff's performance continued to deteriorate after his meeting with Bryant.  (*See* Dkt. 39-1 at 60; *see also* Dkt. 33 ¶ 38.) Barrett subsequently identified a different senior analyst role in payroll, which offered "the same pay, title, bonus structure[,] and benefits." (Dkt. 39-1 at 60; *accord* Plaintiff Deposition at 305–06.)  Plaintiff testified that it is his "understanding" that he now "work[s] . . . for LaTanya Clarke under payroll audit" but that this is not the job he originally interviewed for and that he "just got put in this position." (*Id.* at 397–98.) The parties stipulated that Plaintiff is still "employed as a[ senior analyst] in [p]ayroll in the same department" and that he has been in this new position for almost three years as of May 1, 2024. (Dkt. 33 ¶ 32.)  The parties also stipulated that Plaintiff "likes the challenge of helping people figure out their issues" and that he "has received

positive performance reviews in this position and thinks he is doing his job well." (*Id.* ¶¶ 35–36; *accord* Plaintiff Deposition at 73, 399.)  Plaintiff has not sought to transition to another role, either within or without VCRG.  (*See id.* at 73–74.)  For her part, Coleman testified that she played no role in Plaintiff's transfer to the other team and that she only found out about the transfer after the fact.  (Dkt. 38-1 at 13; Dkt. 39-1 at 10.)  Coleman also stated in her declaration that after Plaintiff's departure, she "filled his position with Frank Williams, a [b]lack male."  (Dkt. 39-1 at 11.)

Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) on February 10, 2022, alleging that he had been discriminated against on the basis of his race and gender and that he had been retaliated against for complaining about Coleman.  (Dkt. 49-1 at 365–70.)  Plaintiff received a Notice of Right to Sue from the EEOC on March 14, 2022.  (Dkt. 1 at 14.)  Plaintiff filed suit in state court on November 22, 2022, raising counts of race and gender discrimination and retaliation under the Florida Civil Rights Act (FCRA).  (Dkt. 1 at 19–21.)  Defendant subsequently removed the case to this court based on diversity jurisdiction.  (*See id.* at 1–10.)  Discovery ended on April 1, 2024.  (Dkt. 24 at 1.)  Defendant now moves for summary judgment, (Dkt. 32), which Plaintiff opposes, (Dkt. 41).  Defendant also moves to strike screenshots and documents Plaintiff attached to, and statements Plaintiff included in, his response.  (Dkt. 43.)

## APPLICABLE STANDARDS

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

- 14 -

The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment.  Fed. R. Civ. P. 56(c)(1)(A).  "The court need consider only the cited materials" when resolving the motion.  Fed. R. Civ. P. 56(c)(3); *see HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) ("This rule was implemented so that a court may decide a motion for summary judgment without undertaking an independent search of the record." (quotation omitted)).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict for the non[-]moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*  The moving party bears the initial burden of identifying those portions of the record showing a lack of a genuine factual dispute.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  If the movant shows that no evidence supports the non-moving party's case, the burden then shifts to the non-moving party to show that there are, in fact, genuine factual disputes precluding judgment as a matter of law.  *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the non-moving party must

go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *see also HRCC*, 703 F. App'x at 816–17 ("Presenting arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court." (alteration adopted) (quoting *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990))).  In determining whether a genuine dispute of material fact exists, the court must view the evidence and draw all factual inferences in the light most favorable to the non-moving party and must resolve any reasonable doubts in that party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).  The court will not weigh the evidence or make findings of fact.  *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).  Summary judgment should be granted only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non[-]moving party." *Matsushita*, 475 U.S. at 587.

## ANALYSIS

In its motion to strike, Defendant argues that the court should not consider certain documents and statements Plaintiff relies on in his response because they have not been authenticated and lack probative value.  (*See* Dkt. 43.)  In its motion for summary judgment, Defendant argues that Plaintiff cannot establish his claims of discrimination on the basis of gender and race, or his claim of retaliation, and thus,

that the court should grant it summary judgment as to those claims.[4]  (*See* Dkt. 32.)

The court considers each of these arguments in turn.

## A. Admissibility of Evidence

Defendant moves to strike certain statements from Plaintiff's response and

documents Plaintiff has attached to his response that it argues are inadmissible.  (Dkt.

43 at 1.)  "Under Federal Rule of Civil 56(c)(2), '[a] party may object that the material

cited to support or dispute a fact cannot be presented in a form that would be

admissible in evidence.'"  *Stolinas v. Palmer*, 512 F. Supp. 3d 1264, 1267 (M.D. Fla.

2011) (quoting *Ekokotu v. Fed. Exp. Corp.*, 408 F. App'x 331, 335 (11th Cir. 2011)).

"[O]therwise admissible evidence may be submitted in inadmissible form at the

summary judgment stage, though at trial it must be submitted in admissible form."  *Id.*

(internal quotation marks omitted) (quoting *McCaskill v. Ray*, 279 F. App'x 913, 914

(11th Cir. 2008)).

Defendant argues on authentication grounds that the court should not consider

screenshots, (Dkts. 41-2, 41-4), or the Verizon Intellectual Property Agreement, (Dkt.

---

[4] Defendant also argues that Plaintiff was employed by VCRG, not Defendant, and thus, that he has sued the wrong entity.  (*See* Dkt. 32 at 13–15.)  Because the court finds that Defendant is entitled to summary judgment as to all of Plaintiff's claims the court does not reach this issue.  The court briefly notes, however, that Plaintiff has likely presented sufficient evidence to raise a genuine dispute of material fact as to whether Defendant and VCRG constitute a single employer.  (*See* Dkt. 41-1 at 31, 41-3 at 1–2); *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1341 & n.5 (11th Cir. 1999) (stating the standard used in the single-employer analysis); *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987) (finding that the "evidence clearly raise[d] a genuine issue of material fact" as to whether two entities were a single employer where "there was common ownership[] and, to some extent, common management"); *Virciglio v. Work Train Staffing LLC*, 674 F. App'x 879, 890 (11th Cir. 2016) (determining evidence was sufficient to support a finding that two limited liability corporations were a single employer where "the two entities ha[d] common management and owners[] and . . . exercise[d] centralized control over their operations from a common home office").

41-1).  "Prior to 2010, a party was required to authenticate documents for them to be considered in support of summary judgment.  However, Rule 56 was amended in 2010 so that authentication is not required until an objection has been raised that the evidence *cannot* be submitted in an admissible form."  *Strong v. GEICO Gen. Ins. Co.*, No. 8:16-cv-1757-T-36JSS, 2017 WL 11884598, at *6 (M.D. Fla. Oct. 13, 2017). "Because it is no longer required that Plaintiff submit authenticated documents in opposition to summary judgment, and because Defendant[] ha[s] not objected that Plaintiff's exhibits could not be presented in admissible form should this case proceed to trial, the objection is overruled."  *See Rosbough v. Fla. State Univ.*, No. 4:15cv583-RH/CAS, 2017 WL 4019452, at *2 (N.D. Fla. Aug. 21, 2017), *report and recommendation adopted in relevant part by* 2017 WL 4012962 (N.D. Fla. Sept. 12, 2017).

Defendant also argues that the court should not consider the Verizon Intellectual Property Agreement because "Plaintiff uses this document solely for purposes of speculation" and it therefore "has no probative value or relevance that could create a genuine dispute of fact." (Dkt. 43 at 5.)  The court disagrees and finds that the document does possess probative value concerning the relationship between Defendant, Verizon Communications, Inc., and VCRG, which is essential to Plaintiff's argument that these entities can be regarded as a single employer for the purposes of this lawsuit.  (*See supra* n.4); *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2014) ("As evidence becomes more essential, its probative value becomes greater.").

The balance of Defendant's motion to strike argues that the court should not consider the unsupported, contradictory, and speculative assertions that Plaintiff makes in his response.  (Dkt. 43 at 4–7.)  The court agrees that, to the extent that Plaintiff's assertions are without support, they cannot be relied upon to create a genuine dispute of material fact.  *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").  However, the court denies Defendant's motion to strike these statements because Plaintiff's response, on its own, holds no evidentiary value.  *See Johnson v. Fee*, 838 F. App'x 394, 400 (11th Cir. 2020) (noting that an "unsworn statement in [the plaintiff's] brief is not evidence").  Accordingly, there is no need to strike statements from the response itself, as the court will not consider them as Rule 56 evidence in ruling on the motion for summary judgment.  *See Ellis*, 432 F.3d at 1326 ("For factual issues to be considered genuine, they must have a real basis in the record.").  Accordingly, Defendant's motion to strike is denied.

## B.  Plaintiff's Disparate Treatment Claims (Counts I and II)

It is unlawful under the FCRA for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . [or] sex."  *See* Fla. Stat. § 760.10(1)(a).  "Because the FCRA is modeled after Title VII, causes of action under the two statutes are analyzed the same."  *Lewis v. Tenga, Inc.*, No. 8:24-cv-00402-WFJ-SPF, 2024 WL 1604073, at *2 (M.D. Fla. Apr. 12, 2024) (citing *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010)); *see* 42 U.S.C. § 2000e-2(a)(1).

Employment discrimination claims brought under the FCRA may be established by either direct or circumstantial evidence. *Eliassaint v. RTG Furniture Corp.*, 551 F. Supp. 3d 1293, 1303 (M.D. Fla. 2021) (citing *Alvarez*, 610 F.3d at 1264). "[B]ecause [Plaintiff] neither presents any direct evidence nor make[s] any argument to that end, the [c]ourt looks to circumstantial evidence to establish [his] discrimination claim . . . ." *See id.* at 1304.

In his response, Plaintiff argues that the record demonstrates a genuine dispute of material fact as to discrimination under three theories he regards as separate: the *McDonnell Douglas*[5] framework, the convincing mosaic metaphor, and the motivating factor standard. (Dkt. 41 at 11.) The *McDonnell Douglas* framework and the convincing mosaic metaphor are used in evaluating single-motive claims, where it is alleged that "bias was the true," and only, "reason for the adverse [employment] action." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). The motivating factor standard, on the other hand, is applied to mixed-motive claims where it is alleged that "bias based on sex or gender was a motivating factor for an adverse employment action, even though other factors also motivated the action." *Id.* (cleaned up). The court considers the single-motive theories first and then the mixed-motive theory.

### 1. The *McDonnell Douglas* Framework and the Convincing Mosaic Metaphor

Given the difficulties inherent in proving that the reason an employee was fired or disciplined was discriminatory, "the Supreme Court in *McDonnell Douglas* set out a

---

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

burden[-]shifting framework designed to draw out the necessary evidence in employment discrimination cases." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 944 (11th Cir. 2023).   Under this framework, the burden is on the plaintiff first to "establish[] what *McDonnell Douglas* calls a 'prima facie' case of discrimination" by showing that (1) he "belongs to a protected class," (2) he "was subjected to an adverse employment action," (3) he "was qualified to perform the job in question," and (4) his "employer treated 'similarly situated' employees outside h[is] class more favorably." *Id.* (quoting *McDonnel Douglas*, 411 U.S. at 802).   "The prima facie showing entitles the plaintiff to a rebuttable presumption of intentional discrimination," which the defendant may then rebut "by offering evidence of a valid, non[]discriminatory justification for the adverse employment action."  *Id.*  If the defendant is successful in rebutting the presumption of discrimination, the burden shifts back to the plaintiff to "show not only that the employer's justification was pretextual, but that the real reason for the employment action was discrimination."  *Id.*

Defendant contends that the evidence presented fails to establish a dispute of material fact as to whether Plaintiff suffered an adverse employment action and fails to identify a similarly situated comparator.  (Dkt. 32 at 15–20.)  Defendant argues in the alternative that, insofar as its actions did constitute adverse employment actions, they were grounded in legitimate business reasons that Plaintiff cannot demonstrate are pretextual.  (*Id.* at 20–21.)  Ultimately, Defendant asserts that Plaintiff has failed to provide any Rule 56 evidence which, construed in the light most favorable to

Plaintiff, demonstrates that he was subject to any illegal discrimination. (*See id.* at 19–20.)

### a) Adverse Employment Action

Plaintiff claims that he was "relieved of his responsibilities from completing a significant project," that is, the Confluence Project. (Dkt. 1 at 19.) "The inability to complete the [Confluence P]roject will," he alleges, "have a direct impact on his ability to be promoted to a more senior, higher paying position." (*Id.*) Plaintiff also claims that his having been relegated to performing tasks under Harris constitutes a constructive demotion. (*See* Dkt. 41 at 12–13; *see also* Plaintiff Deposition at 246–47.) In making these arguments, Plaintiff relies exclusively on the Supreme Court's decision in *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). (*See* Dkt. 41 at 12–13.) In *Muldrow*, the Court determined that a police sergeant who was forcibly transferred from one division to another had suffered an adverse employment action, even though her "rank and pay remained the same," because "her responsibilities, perks, and schedule did not." 601 U.S. at 351. Plaintiff argues that his case is analogous because he was "stripped . . . of the task[s] and responsibilities he [had] held," especially the Confluence Project. (Dkt. 41 at 12–13.) The court rejects this argument.

"An adverse employment action is an ultimate[] employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Menzie v. Ann*

*Taylor Retail Inc.*, 549 F. App'x 891, 894 (11th Cir. 2013).  To demonstrate an adverse employment action, a plaintiff "must show some harm respecting an identifiable term or condition of employment," but he need not show that the discriminatory harm he suffered was "serious, or substantial, or any similar adjective suggesting that the disadvantage to [him] . . . exceed[ed] a heightened bar."  *Muldrow*, 601 U.S. at 354–55; *see id.* at 355 ("'Discriminate against' means treat worse, here based on sex.  But neither that phrase nor any other says anything about how much worse." (citation omitted)).  Plaintiff must show that Defendant's "actions 'brought about some "disadvantageous" change in an employment term or condition.'" *Lukie v. Metlife Grp., Inc.* ("*Lukie II*"), No. 22-10967, 2024 WL 4471109, at *5 (11th Cir. Oct. 11, 2024) (quoting *Muldrow*, 601 U.S. at 354).

Accordingly, while the Supreme Court in *Muldrow* unequivocally "lower[ed] the bar [that] Title VII," and thus FCRA, "plaintiffs must meet" to establish an adverse employment action, 601 U.S. at 356 n.2, under the applicable law "not everything that makes an employee unhappy is an actionable adverse action." *See Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).  This conclusion follows from the statutory language, which, as the *Muldrow* Court noted, refers to the terms or conditions of employment; while this language is to be read broadly, it nevertheless operates to "circumscribe[] the injuries that can give rise to a[n employment discrimination] suit." *Id.* at 347.

Here, the adverse employment actions undergirding Plaintiff's discrimination claims—his being removed from the Confluence Project and assigned to work under Harris—essentially involve work assignments.  (*See* Dkt. 1 at 19; Dkt. 41 at 12–13.) "[T]he adverse action requirement must be carefully applied where the plaintiff's claim is based on disagreement with the employer's work assignments." *Lukie v. Metlife Grp., Inc.* ("*Lukie I*"), No. 8:20-cv-943-TPB-AAS, 2022 WL 562340, at *4 (M.D. Fla. Feb. 24, 2022).  That is because "[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise and because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1244 (11th Cir. 2001), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  "A contrary view would potentially open the door to a wide variety of unfair work assignment claims that should not be litigated in federal courts," as federal courts were not intended to "sit as a super-personnel department that reexamines an entity's business decisions." *Id.* (internal quotation marks omitted) (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).

From Plaintiff's response, his being stripped of the Confluence Project appears to be a primary concern.  (*See* Dkt. 41 at 12–13; *see also* Dkt. 1 at 19; Dkt. 49-1 at 351 ("Confluence seems like it might be the big thing that bother[ed] [Plaintiff].").)  Even under *Muldrow*'s lowered standard, this change in work assignment does not qualify as an actionable adverse employment action.  At least one other district court has determined that a plaintiff's being stripped of job responsibilities that a plaintiff

- 24 -

particularly enjoys or finds especially important, absent more, does not constitute an adverse employment action because it does not affect the terms or conditions of the plaintiff's employment. *See Qashu v. Blinken*, No. 1:22-cv-01077 (TNM), 2024 WL 3521592, at *6 (D.D.C. July 24, 2024).[6]  The plaintiff in *Qashu* argued, and the court accepted as true, that "her ocean acidification duties were stripped." *Id.* at *5 (internal quotation marks omitted).  The question the court then turned to was "whether [the plaintiff]'s assignment to ocean acidification work was a 'term, condition, [or] privilege' of her employment." *Id.*  The court determined that it was not:

> The ocean acidification portfolio was a work assignment that [the plaintiff] especially enjoyed.  But it was only that.  No record evidence supports the notion that it was either a term or a condition of her employment [with the defendant].  She was not hired on specifically to do that work.  Nor was she assigned a role [with the defendant] as a dedicated ocean acidification researcher.  Nor still does the record evidence support the notion that she was informally considered to be integral to the office's ocean acidification work.  In sum, although ocean acidification was a matter that [the plaintiff] worked on, and which she greatly enjoyed, it was *not* a term or condition of her employment [with the defendant].

---

[6] The *Qashu* court was considering a discrimination claim brought against the federal government under the Rehabilitation Act, which "adopts the standards of the Americans with Disabilities Act (ADA) and applies them to federal employees." 2024 WL 3521592, at *4.  Just like Title VII and the FCRA, the ADA prohibits discrimination with regard to the "terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a), and thus, courts interpreting one statute often look to caselaw interpreting the other. *See, e.g.*, *Dekalb*, 145 F.3d at 1448 (acknowledging that the ADA and Title VII require "the same 'adverse employment action' requirement" and observing that "[w]e can assist our consideration of the adversity standard under the ADA, therefore, by looking to the broader experience of our court and others with employment discrimination law.").  At the end of this inferential chain is the conclusion that the *Qashu* court was applying essentially the same standard as this court in considering Plaintiff's FCRA claim, and thus, its analysis of that statute is helpful even in this different context. *See* 2024 WL 3521952, at *5–6.

*Id.* at *6 (internal citations omitted).

Here, similarly, according to the job description provided for the senior analyst position, updating Confluence was simply one of the many tasks assigned to senior analysts.  (*See* Dkt. 49-1 at 381; *see also* Dkt. 39-1 at 4.)  Senior analysts were also responsible for fielding questions from other VCRG employees, auditing calls and emails to ensure that the EPS team was providing accurate information, and supporting the EPS team's supervisors, among many other duties.  (Dkt. 49-1 at 381; *see also* Dkt. 39-1 at 3–4.)  Indeed, Plaintiff testified that throughout his time on the EPS team, he was assigned tasks outside of the Confluence Project that were listed in this job description.  (Plaintiff Deposition at 378–83.)  There is no record evidence to suggest that the Confluence Project was a term or condition of Plaintiff's employment at VCRG—it was a project that he appeared to particularly enjoy, but that is not enough.

Nor does Plaintiff's being tasked with call and email audits under Harris following the EPS team's realignment constitute an adverse employment action. These tasks were within the job description of senior analysts and thus were tasks Plaintiff always could have been asked to complete in that role.  (*See* Dkt. 39-1 at 13.) The Eleventh Circuit recently held, in an analogous case, that a plaintiff who was given various administrative tasks, including "taking notes during meetings, assembling slides, and organizing PowerPoint presentations," failed to carry her burden at the summary judgment stage to demonstrate an adverse employment action.  *Lukie II*, 2024 WL 4471109, at *5.  The Eleventh Circuit reasoned that the plaintiff had "fail[ed]

to demonstrate how the tasks she was asked to perform . . . were outside the terms and conditions of her employment."  *Id.; see also Murray v. Learjet, Inc.*, No. 24-11189, 2024 WL 4707968, at *2 (11th Cir. Nov. 7, 2024) ("There is no evidence that the jobs [the plaintiff] was assigned were not already within his job duties, such that they could constitute a change in his employment conditions.").

While Plaintiff testified that he did not believe the project he was given under Harris—evaluating the performance of her employees—was unimportant, (Plaintiff Deposition at 246), he now states in his response that he "went from being a leader, managing those within a project, to an [a]ssistant" under Harris, (Dkt. 41 at 13). Similarly, he maintains that after he was removed from the Confluence project, he was afforded less visibility within the EPS team.  (*Id.* at 12–13.)  In other words, Plaintiff challenges the loss of authority and workplace prestige, but such claims have not been favored in this Circuit.  *See Davis*, 245 F.3d at 1245 ("In the vast majority of instances . . . an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause . . . ."); *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1203 (11th Cir. 2013) ("Because [the plaintiff]'s demotion claim is grounded on a loss of supervisory responsibility, it is one our circuit does not favor.").

Even after *Muldrow*, Plaintiff must show that the claimed adverse employment action injured him or otherwise left him worse off.  601 U.S. at 359 ("[A plaintiff] need show only some injury respecting her employment terms or conditions.  The transfer must have left her worse off, but need not have left her significantly so."); *see Murray*,

2024 WL 4707968, at *2 ("[T]here must be some change in an identifiable employment term or condition that left [the plaintiff] worse off.").  Plaintiff has not made this showing.  To the contrary, according to his paystubs, he has received multiple pay raises since beginning with VCRG—before, during, and after the period pertinent to this case.  (*See* Dkt. 49-1 at 21, 50, 80, 108, 116, 135, 188, 229.)  Plaintiff also testified that he and his supervisors feel he is performing well in his new role with VCRG.  (Plaintiff Deposition at 399 ("My supervising manager ha[s] told me that I'm doing my job well. . . .  I think I'm doing my job superb[ly].").)  In any event, he has not sought to transition to another role, either within or without VCRG.  (*See id.* at 73–74.)  Ultimately, Plaintiff has not adduced contradictory evidence to demonstrate that he has been injured or left worse off.  *See Murray*, 2024 WL 4707968, at *2 (finding that the plaintiff had produced no evidence he was injured or left worse off where he "received good ratings, never applied for a promotion, and voluntarily retired"); *Lussier v. City of Cape Coral*, No. 2:23-cv-00021-JLB-NPM, 2024 WL 3673603, at *7 (M.D. Fla. Aug. 6, 2024) (determining that the plaintiff had failed to evince an adverse employment action where her "pay, benefits, and title never changed" and the plaintiff otherwise failed to indicate how she had been injured or left worse off).  Accordingly, Defendant is entitled to summary judgment on Plaintiff's disparate treatment counts.

### b) Comparator

Even if Plaintiff were able to show that he had suffered an adverse employment action, he has failed to identify a proper comparator.  Plaintiff bears the burden of identifying a comparator with whom he was "similarly situated in all material

respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1217, 1229 (11th Cir. 2019) (en banc).  The *McDonnell Douglas* framework imposes the comparator requirement as a proxy for direct evidence of discriminatory intent because if a plaintiff can point to a comparator of a different race or gender who was similarly situated with the plaintiff but was nevertheless treated differently, a rational explanation for that disparity would be discrimination.  *See id.* at 1222–23.  "A plaintiff's failure to produce evidence showing that a single similarly situated employee was treated more favorably will preclude the establishment of a prima facie case" under the framework.  *Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021).

Plaintiff posits a single comparator: Katsov, "a white female, who worked under the same supervisor, Coleman, within the same department."  (Dkt. 41 at 13.)  While the question of whether a would-be comparator and a plaintiff are similarly situated is to be "worked out on a case-by-case basis," courts have held that, generally, a proper comparator will have "engaged in the same basic conduct as the plaintiff," "been subject to the same employment policy, guideline, or rule as the plaintiff," "been under the jurisdiction of the same supervisor as the plaintiff," "and share[d] the plaintiff's employment history."  *Eliassaint*, 551 F. Supp. 3d at 1303 (quoting *Lewis*, 918 F.3d at 1226, and then *Earle*, 843 F. App'x at 166).  In his response, however, Plaintiff notes only that he and Katsov both worked on the EPS team under Coleman, but he fails to provide caselaw to demonstrate that this is sufficient to satisfy the standard—similarly situated in *all material respects*.  *Lewis*, 918 F.3d at 1218.  (*See* Dkt. 41 at 13–14.)  Plaintiff's position is therefore unpersuasive.  *See Murphy v. Carnival Corp.*, 426 F. Supp.

3d 1311, 1316 (S.D. Fla. 2019) ("[U]nder the adversary system, it is counsel's responsibility to explain why these points have legal merit.") (quotation omitted)).

Moreover, there are at least two critical distinctions between Plaintiff and Katsov. First, Plaintiff does not point to any record evidence to suggest that Katsov was subject to complaints from coworkers on the EPS team, as was Plaintiff. (*See, e.g.*, Dkt. 49-1 at 387–88.) Second—and most significantly—Katsov applied for the consultant role. (Dkt. 33 ¶ 10.) Plaintiff did not. (Plaintiff Deposition at 267.) This difference is key. *See Edwards v. Compass Bank*, No. 2:18-CV-740-RDP, 2019 WL 6701970, at *9 (N.D. Ala. Dec. 9, 2019) (holding that a black candidate for a position was "not an appropriate comparator" for the white plaintiff because the candidate "applied for the position" while the "[p]laintiff did not apply").

Plaintiff maintains that his failure to apply for the consultant role does not foreclose his claims because "Katsov was given . . . [his] job responsibilities before the . . . position was created," (Dkt. 41 at 14), and in fact the position was created simply to make this transfer of responsibilities "official," (*id.*). Even if the court accepts that Katsov was given Plaintiff's tasks before the position was created, the position was nonetheless announced to the entire EPS team, and Plaintiff was expressly invited to apply but chose not to do so. (*See, e.g.*, Plaintiff Deposition at 242.) Indeed, Plaintiff testified that he told Coleman that he was not interested in the position. (*Id.* at 277.) For Plaintiff to demonstrate that Katsov is a suitable comparator, he would have needed to show that he, too, applied for the consultant role. *See Chapman v. Wilkie*, No. CV 318-014, 2018 WL 4903264, at *4 (S.D. Ga. Oct. 9, 2018) ("[The p]laintiff did

not even apply for the readvertised position of [r]egistered [n]urse; thus, [she] can hardly be similarly situated to the applicant who was hired." (citation omitted)).

Plaintiff's other argument, that VCRG's "culture" is such that "one does not get hired by simply applying for a vacant position" but rather "must first establish[] relationships with supervisors and hiring managers who then advise . . . on positions to apply for," is similarly unavailing. (Dkt. 41 at 14.) Plaintiff was expressly invited to apply for the consultant position by his manager. (Plaintiff Deposition at 242; Dkt. 38-1 at 9.) Accordingly, it is not clear to the court that Katsov could not "reasonably be distinguished" from Plaintiff, and thus, the court finds that she is not a proper comparator. *See Lewis*, 918 F.3d at 1228 ("An employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—*e.g.*, who engaged in different conduct, who were subject to different policies, or who have different work histories.").

### c) Pretext and the Convincing Mosaic

Even if Plaintiff had demonstrated both an adverse employment action and a suitable comparator and thus established a prima facie case under *McDonnell Douglas*, he has not shown that Defendant's nondiscriminatory reasons for realigning the tasks assigned to the various members of the EPS team, including Plaintiff, were mere pretext for discrimination. *See McCreight v. AuburnBank*, 117 F.4th 1322, 1335 (11th Cir. 2024) ("Once th[e] initial burden [under *McDonnell Douglas*] is met, the employer must articulate a legitimate, nondiscriminatory reason for its adverse employment action, and then, finally, the plaintiff must show that the employer's reason is pretext

for unlawful discrimination."). "[T]he *McDonnell Douglas* framework does not shift the burden of persuasion [for the discrimination claims] to the defendant; instead, once the employee establishes a prima facie case of discrimination, the burden of *production* is shifted to the employer to articulate a legitimate, non[]discriminatory reason for the adverse employment action." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013). This burden is "exceedingly light." *Turnes v. Amsouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994) (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)). "The inquiry as to pretext is based on the employer's beliefs, and not the employee's own perceptions of [his] performance." *Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886, 888 (11th Cir. 2013) (quotation omitted).

> Thus, [a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

*Id.* at 888–89 (quotation omitted).

Both the pretext prong under *McDonnell Douglas* and the convincing mosaic metaphor "merge[] with the plaintiff's ultimate burden of persuading the factfinder that []he has been the victim of intentional discrimination." *McCreight*, 117 F.4th at 1335 (quotation omitted); *see id.* ("[T]he *McDonnell Douglas* framework and the convincing mosaic approach are two paths to the same destination—the ordinary summary judgment standard. One approach is not more forgiving than the other on

the final question, which is whether a reasonable jury could infer illegal discrimination." (citation omitted)).   Accordingly, the court proceeds under these nominally distinct, but substantively identical, "paths" simultaneously.  *See id.*

The parties stipulated that "[a]round March 16[,] 2021, . . . Castellanos . . . left Coleman's team," and that, in a meeting with Plaintiff that same day, Coleman "told Plaintiff, that as a result of the realignment of duties from Castellanos'[s] . . . departure, he would support Harris'[s] . . . team within EPS, focusing on quality."  (Dkt. 33 ¶¶ 7–8; *accord* Dkt. 39-1 at 4–5 ("Around March 16, 2021, [s]enior [a]nalyst Alice Castellanos departed from [the EPS] team.   Her departure required [Coleman] to realign tasks with the remaining members of the EPS team. . . .   Everyone's tasks were realigned.   The realignment affected everyone on [the] team.").)  Defendant also provided evidence, in the form of Coleman's deposition testimony and declaration, that the consultant role "was created because [VCRG was] moving to a new payroll system" and thus required a role that could "focus on some of [VCRG's] reporting needs" and would not be responsible for taking escalations like the senior analysts were but would still "perform[] some of the same functions as [s]enior [a]nalysts." (Dkt. 38-1 at 10; Dkt. 39-1 at 6.)  Thus, Defendant has articulated legitimate, nondiscriminatory reasons for reassigning tasks within the EPS team and creating the consultant position.  *See Hampton v. Buckhead Beef Co.*, No. 1:09-CV-0175-JEC-SSC, 2010 WL 11500521, at *11 (N.D. Ga. July 30, 2010) (determining that defendant articulated a legitimate, nondiscriminatory reason for creating one position while eliminating another given the defendant's stated need for the new position),

*report and recommendation adopted by* 2010 WL 11508311 (N.D. Ga. Sept. 27, 2010); *Anioce v. Oscient Pharms. Corp.*, No. 6:07-cv-296-Orl-22DAB, 2008 WL 11336617, at *4 (M.D. Fla. Oct. 15, 2008) (determining that the defendant's decision to terminate the plaintiff "as part of a company-wide realignment which resulted in the merger of" two of the defendant's territories constituted "a legitimate, nondiscriminatory reason" for the termination).

Moreover, the record indicates, as has been noted above, that Plaintiff was the subject of complaints from his coworkers regarding his behavior toward them.  (*See, e.g.*, Dkt. 49-1 at 387–88; Plaintiff Deposition at 416.)  He also demonstrated a decline in his performance and attendance.  (*See, e.g.*, Dkt. 39-1 at 8 ("In April and early May, [Coleman and Harris] began having issues with [Plaintiff]'s performance.  He was not getting his quality audits done timely.  On May 18, 2021, [Coleman and Harris] met with him about his performance, including why his April [q]uality [a]udits were not completed, his attendance, and that his team felt he was not contributing.").)  Additionally, Coleman sent Koslik and Bryant the following email on May 28, 2021:

> [Plaintiff] scheduled a vacation day today so I have canceled our scheduled [one-on-one]. . . .  I do need to address his performance soon as it is negatively impacting his peers and I am continuing to receive messages such as the [attached message from Harris] where he is not taking escalations and [is] continuing to []extend breaks/lunches. . . .  I am pretty flexible with these one-off situations as long as the team is covered and the time is made up[;] however, in this instance, it is continuing to occur and being "told" [versus] "requested/approved" by me[,] which is the process he should be following.

(*Id.* at 39.)   Thus, to the extent that Plaintiff claims he was removed from certain attractive projects and relegated to positions with more oversight than he desired, the complaints and performance reviews constitute legitimate, nondiscriminatory reasons for the employment decisions.  *See Poer v. Jefferson Cnty. Comm'n*, 100 F.4th 1325, 1339 (11th Cir. 2024) (concluding that the plaintiff did not demonstrate pretext when she did not rebut the defendant's legitimate nondiscriminatory reasons for terminating her, which included that she had "exhibited multiple performance issues" and "displayed interpersonal conflicts with her supervisor, coworkers, and subordinates"); *White v. IJE Hosp., LLC*, No. 1:22-cv-02595-CAP-RDC, 2024 WL 2877019, at *16 (N.D. Ga. Jan. 24, 2024) (considering evidence that the defendant considered the plaintiff's absences "to be a problem" and recommending summary judgment for the defendant on the plaintiff's discriminatory termination claim), *report and recommendation adopted by* 2024 WL 2876994 (N.D. Ga. Mar. 29, 2024).

To demonstrate that these reasons are mere pretext, Plaintiff was required to prove by the preponderance of the evidence both that the stated reasons were not true and that discrimination was the real reason.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[T]he plaintiff must . . . prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." (quotation omitted)); *Poer*, 100 F.4th at 1336 ("If, at summary judgment, an employer meets its burden of articulating a non[]discriminatory reason for any purportedly adverse action, to avoid summary judgment the plaintiff must introduce significantly probative evidence showing that

the asserted reason is merely a pretext for discrimination.  A reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." (cleaned up)).

Plaintiff argues that, of all the members of the EPS team, he was the only one assigned to an allegedly inferior position. (Dkt. 41 at 15.)  However, Plaintiff testified that he did not believe that the work he was performing under Harris was unimportant nor that he had been assigned this work as the result of discrimination.  (Plaintiff Deposition at 246.)  Moreover, he cites no record evidence to support his assertion that no one else on the EPS team was assigned an equivalent task, (*see* Dkt. 41 at 15), whereas Defendant provided evidence that, both before and after Castellanos's departure, senior analysts routinely audited their communications with VCRG employees "to ensure [that] consistent communications and information [were] being given to employees," (Dkt. 39-1 at 3–4; *see* Dkt. 38-1 at 9–10).  Even if it were true that none of the other senior analysts were assigned the tasks Plaintiff was, it would not follow from this fact that Defendant's stated reason for the realignment was false.  That is, it could simultaneously be true that Plaintiff was given tasks he did not like as part of the EPS team's realignment but that this realignment was nevertheless the result of Castellanos's departure rather than discrimination.

This reasoning is also fatal to Plaintiff's other argument, that Katsov was given Plaintiff's duties before she became the consultant. (Dkt. 41 at 15.)  Again, assuming that this is true, Katsov could have been assigned tasks that Plaintiff enjoyed as part of the realignment, which occurred after Castellanos left on March 16, 2021, before being

assigned those tasks in some more permanent form as a consultant, which position was announced about one month after Castellanos's departure.  (*See* Dkt. 33 ¶¶ 7, 9, 14.)  Accordingly, Plaintiff has failed to "reveal[] such weaknesses, implausibilities, inconsistencies, incoherencies[,] or contradictions in [Defendant's] proffered legitimate reasons for its actions [such] that a reasonable factfinder could find [the reasons] unworthy of credence."  *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (quotation omitted).

Even if Plaintiff could show that Defendant's reasons were false, he has failed to adduce evidence demonstrating that any of Defendant's actions were motivated by discrimination.  *See id.* at 1349 ("[A] reason is not pretext for discrimination unless it is shown *both* that the reason was false[] *and* that discrimination was the real reason." (quotation omitted)).  When pressed throughout his deposition on this point, Plaintiff repeatedly stated that he was not sure why he was being discriminated against.  (*See, e.g.*, Plaintiff Deposition at 279:25–280:8 ("Q:  And you thought [Harris] was doing that because you're black?  A: No.  I don't know why [Harris] was doing what she was doing. . . .  I have no idea what the[] motivation was.  And I have no idea why [Harris and Coleman] did what they did."); *id.* at 328:15–18 ("Q:  And it's your belief that . . . Coleman treated you differently, both because you're a male and because you're black?  A:  I don't know why she did what she did.").)  Plaintiff fails to cite to record evidence of discrimination sufficient to support Plaintiff's burden on this point. *See St. Mary's*, 509 U.S. at 515; *Springer*, 509 F.3d at 1348.

Plaintiff contends that the GIF Coleman sent, depicting a black man dancing and rejoicing that it was Friday, was intended to "mock[] him, the only male on the team" at that time.  (Dkt. 41 at 16.)  However, Coleman stated in her declaration that she sent this image merely "to celebrate the end of the week," and that, upon learning from Plaintiff that he found the image offensive, she immediately met with Plaintiff to discuss his perspective on the image.  (Dkt. 39-1 at 9–10; *see also* Dkt. 33 ¶ 25 ("Coleman told Plaintiff she never intended [the GIF] to be hurtful towards him, thanked him for his honesty, and encouraged him to continue to let her know if anything is upsetting him.").)  Indeed, the record reveals that Plaintiff has had difficulty identifying instances of gender- or race-based discrimination.  (*See, e.g.*, Dkt. 39-1 at 66; Plaintiff Deposition at 256.)

Finally, the record demonstrates not only that the EPS team employed several black people but also that after Plaintiff transitioned to the other team in the payroll department, Coleman replaced him with Frank Williams, a black male.  (Plaintiff Deposition at 165–66; Dkt. 38-1 at 14.)   *See Robertson v. Interactive Coll. of Tech./Interactive Learning Sys., Inc.*, 743 F. App'x 269, 277 (11th Cir. 2018) ("[The plaintiff] did not establish a prima facie case of race discrimination.  Indeed, after [the plaintiff] was demoted, it is undisputed that [the defendant] replaced him with another African-American employee."); *Hogan v. S. Ga. Med. Ctr.*, 749 F. App'x 924, 932 (11th Cir. 2018) ("Finally, even if [the plaintiff] made a prima facie case of retaliation, the [defendant] has met its burden of presenting legitimate, non[]discriminatory reasons for firing him.  The evidence shows that [the plaintiff] was not performing his job duties

satisfactorily[,] that the hospital placed him on a performance improvement plan[,] and that when his performance did not improve, the hospital terminated him and hired someone from the same protected class as [the plaintiff] to replace him."); *Lewis v. Eufaula City Bd. of Educ.*, 922 F. Supp. 2d 1291, 1299 (M.D. Ala. Dec. 4, 2012) ("[The plaintiff] has put forth nothing that would be sufficient to show that the defendants' proffered explanation . . . was mere pretext for racial discrimination.  Indeed, after her employment ended, she was in fact replaced with another African-American."). Considering the evidence presented, the court finds that no reasonable jury could infer illegal discrimination.  *See McCreight*, 117 F.4th at 1335.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's disparate treatment claims.

### 2.  Motivating Factor

Plaintiff argues that, even if he fails under the *McDonnell Douglas* framework and convincing mosaic metaphor, that he nevertheless "prevails under the motivating factor standard" for mixed-motive claims.  (Dkt. 41 at 16.)  The court disagrees.

Before turning to the substance of Plaintiff's argument, the court notes a procedural flaw.  In his response, Plaintiff effectively treats the motivating factor standard as simply an additional route that any plaintiff can take in claiming discrimination.  (*See id.* ("Assuming *arguendo* the court does not find that the [*McDonnell Douglas*] standard has been met[] or [finds] that there is no convincing mosaic, . . . Plaintiff still prevails under the motivating factor standard.").)  However, the motivating factor theory is "fatally inconsistent with the" *McDonnell Douglas* framework, which "is predicated on proof of a single, 'true reason' for an adverse

action" that "was illegal." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1237 (11th Cir. 2016) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)). Because mixed-motive claims are fundamentally different from single-motive claims, "a plaintiff cannot make only a 'passing reference to a mixed-motive theory' to sufficiently raise the issue." *Smith v. Vestavia Hills Bd. of Educ.*, 791 F. App'x 127, 130 (11th Cir. 2019) (quoting *Keaton v. Cobb County*, No. 08-11220, 2009 WL 212097, at *10 (11th Cir. Jan. 30, 2009)). Accordingly, courts have found that where a plaintiff "does not suggest that unlawful bias, *in addition to other factors*, motivated an adverse action, the plaintiff has not pled a mixed-motive case." *Jones v. Unity Behav. Health, LLC*, No. 9:19-CV-81341-ROSENBERG, 2020 WL 6731679, at *7 (S.D. Fla. Oct. 13, 2020). Here, Plaintiff does not plead that unlawful bias related to race, gender, and retaliation was simply one factor among others but rather asserts unlawful bias as the exclusive motive for Defendant's allegedly illegal acts. (*See* Dkt. 1 at 19–20; *see also* Dkt. 41 at 17.) Because Plaintiff does not delineate what legitimate reasons, if any, Defendant had to carry out its allegedly adverse actions against him, Plaintiff has not properly pleaded discrimination under a mixed-motive theory. *See Patterson v. City of Cape Coral*, No. 2:22-cv-331-SPC-NPM, 2024 WL 1328445, at *6 (M.D. Fla. Mar. 28, 2024) ("The problem for [the p]laintiff is [that] he makes only a passing reference to a mixed-motive theory of discrimination. Nowhere does he say that [the d]efendant had legitimate and illegitimate reasons for [taking the allegedly adverse actions action against him]. Instead, he only argues that [the d]efendant's reasons were illegitimate

and pretextual.   This distinction matters because *McDon[n]ell Douglas*'s pretext requirement is fatally inconsistent with the mixed-motive theory.   Because [the p]laintiff only properly advances a single-motive theory, the [c]ourt need not delve into any mixed-motive content." (citation and quotation omitted)); *Williams v. Fla. Atl. Univ.*, No. 15-60621-CIV-GAYLES/TURNOFF, 2017 WL 1881676, at *8 (S.D. Fla. May 9, 2017) ("In effect, [the p]laintiff pled and continues to argue that [the d]efendants' *sole* motivation was to discriminate based on her race, gender, or age.   As a result, the [c]ourt finds that a mixed-motive analysis is inappropriate."). Nevertheless, the court will consider Plaintiff's argument.

The Eleventh Circuit in *Quigg* held that a mixed-motive plaintiff can prevail on his claim so long as he offers "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff[,] and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action."   814 F.3d at 1239 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)).   Plaintiff argues that the record holds "sufficient circumstantial evidence to create . . . a triable issue as to whether Plaintiff's race []or sex w[as] a motivating factor" with regard to the adverse actions he allegedly suffered. (Dkt. 41 at 17.)   This argument, however, assumes that the record supports that Plaintiff suffered an adverse employment action, which as explained above, the court does not find.

Even if the court assumes an adverse action, Plaintiff fails to demonstrate discrimination under the "lesser, mixed-motive standard." *Breeding v. Integrated Behav.*

- 41 -

*Health Inc.*, No. 22-10374, 2023 WL 3735341, at *3 (11th Cir. May 31, 2023).  In this vein, Plaintiff repeats the arguments he made under his single-motive theories of discrimination:  that he was the only black male on his team, that all of his tasks were taken from him and given to Katsov, that the consultant position was created simply to mask the discrimination motivating this change, and that only Plaintiff "lost all his duties" before being "sent to work as an assistant for another supervisor."  (*See* Dkt. 41 at 17.)  The court rejects these arguments for the same reasons and notes that the record does not support that these decisions were based on race or gender when Plaintiff, after moving on to the separate senior analyst role, was replaced by another black man, especially given Plaintiff's failure to produce evidence demonstrating discriminatory intent, as analyzed above.  *Hodge v. Fed. Express Corp.*, No. 3:14-cv-102-J-34JRK, 2015 WL 5440349, at *13 (M.D. Fla. Sept. 15, 2015) ("To the extent [the plaintiff] argues [that] this incident suggests gender discrimination, because [the plaintiff] states she was replaced with another woman, such an argument is unavailing.").  "Plaintiff has not provided this [c]ourt with any evidence suggesting that [the adverse actions were] due to h[is] gender [or race]. . . .  Thus, under *Quigg*, Plaintiff's [race or] gender was not a 'motivating factor'—or even a factor—for [the actions] . . . ."  *Akridge v. Sch. Bd. of Alachua Cnty.*, No. 1:17cv104-MW/GRJ, 2019 WL 13084482, at *4 (N.D. Fla. May 28, 2019).

Accordingly, Defendant is entitled to summary judgment on Plaintiff's disparate treatment claims.

### C.  Plaintiff's Retaliation Claim (Count III)

Plaintiff also advances a retaliation claim, asserting that he "engaged in protected activity when [he] complained to . . . Defendant's [h]uman [r]esources [d]epartment about the retaliatory acts he was being subjected to because of his previous complaints of discrimination and hostile work environment based upon his race."  (Dkt. 1 at 20–21.)  "Because retaliation claims under the FCRA are substantively similar to Title VII retaliation claims, [courts] use the same analysis for both claims."  *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 n.4 (11th Cir. 2010).  "To make out a prima facie case for retaliation, the plaintiff must show: [(1)] a statutorily protected expression[, (2)] an adverse employment action[, and (3)] a causal link between the protected expression and the adverse action."  *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).  If Plaintiff establishes a prima facie case of retaliation, Defendant can attempt to "articulat[e] a legitimate non[]discriminatory reason for the challenged employment decision," which, once established, would require Plaintiff to "demonstrate that [he] will be able to establish at trial that [Defendant]'s proffered non[]discriminatory reasons are a pretextual ruse to mask retaliation."  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (quotation omitted).  In his response, Plaintiff offers no new arguments for pretext with regard to his retaliation claim.  (*See* Dkt. 41 at 20 ("Plaintiff reasserts his argument on pretext . . . and ask[s] this court to deny Defendant's motion as to this point.").)   Accordingly, because Defendant has proffered legitimate, nondiscriminatory reasons for the actions Plaintiff complains of—stripping Plaintiff's

work assignments and assigning them to another employee, (*id.* at 19)—and because Plaintiff has failed to show that these were mere pretext, his claim for retaliation must also necessarily fail. *See Berry v. Crestwood Healthcare LP*, No. 5:19-cv-01407-LCB, 2022 WL 1096881, at *4 (N.D. Ala. Mar. 8, 2022) ("[The] pretext analysis under *McDonnell Douglas* is the same for race discrimination and retaliation." (citing *Mealing v. Ga. Dep't of Juv. Just.*, 564 F. App'x 421, 427 (11th Cir. 2014), and *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005))).   The court will nevertheless consider whether Plaintiff has made out a prima facie case of retaliation.

"To establish statutorily protected conduct under [the FCRA]'s opposition clause, [a plaintiff] must show that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Howard*, 605 F.3d at 1244 (alteration adopted) (quotation omitted).   "He must show both that he subjectively believed that [his employer] engaged in unlawful discrimination and that his belief was *objectively* reasonable in light of the facts and record present." *Id.* (quotation omitted). Plaintiff's March 23, 2021 email to Barrett constitutes protected activity under the FCRA—Plaintiff clearly stated that he felt he was "being discriminated against and treated unfairly because of [his] race and gender." (Dkt. 49-1 at 344.)  *See Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998) (determining that it was "undisputed" that the plaintiff "engaged in statutorily protected conduct" because he "report[ed] alleged race discrimination"); *Lutz v. LexJax, Inc.*, No. 3:21-cv-936-MMH-PDB, 2024 WL 3584334, at *9 (M.D. Fla. July 30, 2024) ("[The] complaint must

reasonably convey to the employer an allegation of employment discrimination based upon [race or gender] rather than merely a claim related to personal animosity, unfairness, or indecorous treatment generally." (quotation omitted)).

The FCRA's antiretaliation provision "captures those (and only those) employer actions serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination" because "if an action causes less serious harm . . . it will not deter" the enforcement of antidiscrimination laws, "and if it will not deter [such] enforcement, it falls outside the purposes of the ban on retaliation." *Muldrow*, 601 U.S. at 357 (cleaned up) (quoting *White*, 548 U.S. at 68); *see Johnson v. Oconee Ctr. Cmty. Serv. Bd.*, No. 5:24-cv-00208-TES, 2024 WL 4392378, at *9 (M.D. Ga. Oct. 3, 2024) ("*Muldrow* did not . . . change the law with respect to anti[]retaliation claims but merely provided additional reasoning as to why the standards for the anti[]discrimination and anti[]retaliation provisions should, and do, differ." (quotation omitted)).  Accordingly, Plaintiff must show that the adverse actions he points to— having his preferred tasks assigned to others on the EPS team while he was "forced to function in a less prestigious function" under Harris, (Dkt. 41 at 19)—were "materially adverse," "which in this context means [they] well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68 (internal quotation marks omitted) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)); *see also id.* ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms.  Title VII, we have said, does not

set forth 'a general civility code for the American workplace.'" (quoting *Oncale v. Sundower Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998))).

Plaintiff maintains that he "has shown an adverse action" because he was "stripped of his tasks," which were then "reassigned to another employee under the guise of a new position," and that this reassignment is "certainly action that 'would discourage a reasonable employee from making or supporting a charge of discrimination.'" (Dkt. 41 at 19.) Because the court has found that Plaintiff has failed to demonstrate that these constitute an adverse employment action under the lighter standard that applies to discrimination claims, it follows that he has failed to satisfy the more rigorous standard in place for retaliation claims. *See Juarez v. Midwest Div.— OPRMC, LLC*, No. 23-2417-KHV, 2024 WL 4679220, at *7 (D. Kan. Nov. 5, 2024) ("Though the Supreme Court purported to lower the bar for adverse employment action[s] in discrimination cases, it reaffirmed that in retaliation cases, [a] plaintiff must still show that the retaliatory action caused a 'significant' harm, *i.e.*, the employer took action serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination." (quoting *Muldrow*, 601 U.S. at 357)).

Consider the Eleventh Circuit's reasoning in *Howard*. In that case, the plaintiff complained to his district and regional managers that his supervisor, Stephen Krzastek, had left "a very disturbing and unprofessional message . . . on [his] cell phone," indicating that the plaintiff's "Walgreens pharmacy career was jeopardized due to [a] No Call/No Show." 605 F.3d at 1242. This message came in addition to other slights Howard reported to the court, including one occasion when, while

- 46 -

visiting the plaintiff's store, Krzastek "spoke to all the other pharmacy employees, who were white, but not to Howard, the only black employee present," and another when Krzastek used the phrase "you people" toward the plaintiff, who considered that phrase "racially derogatory." *Id.* at 1241. The Eleventh Circuit noted that "[e]ven if Howard subjectively believed that Krzastek unlawfully discriminated against him when he left a message stating that Howard's job was in jeopardy, his belief could not have been objectively reasonable" because a message "threatening" that the plaintiff's job was "in jeopardy . . . falls well short of an adverse action." *Id.* at 1245. Here, Plaintiff's job was never threatened—indeed, after it became clear that Plaintiff's position on the EPS team was untenable because Plaintiff wanted a representative from human resources to be present in every interaction he had with Coleman, VCRG did not terminate Plaintiff but instead moved him to a new team in payroll, where Plaintiff has continued to receive timely pay raises. *See Edwards v. Ambient Healthcare of Ga., Inc.*, 674 F. App'x 926, 930 (11th Cir. 2017) (affirming the district court's dismissal of the plaintiff's retaliation claim under Title VII where the plaintiff "did not allege that [the defendant] cut her pay, took away her title, or did anything other than make her existing job duties more difficult," and noting that "[w]hile an alteration in work assignments may, in unusual circumstances, constitute a serious and material change, that [was] not the case [t]here." (quotation omitted)); *Davy v. Star Packaging Corp.*, 517 F. App'x 874, 877 (11th Cir. 2013) ("[The plaintiff] argues that [the defendant] retaliated against him for filing a charge of discrimination by moving him to [one kind of] machine and failing to train him on [another kind of] machine, but

neither action had a materially adverse effect on [the plaintiff]. The undisputed evidence establishes that [his] rate of pay remained the same despite the changes in his work assignments." (citation omitted)).

Moreover, after making his March 23, 2021 complaint and being subject to the complained-of adverse employment actions, Plaintiff again complained to Barrett about Coleman on July 16, 2021. (Dkt. 39-1 at 72.) As such, it would appear that Plaintiff was not dissuaded from making complaints, which undermines his position that Defendant's actions would have dissuaded a reasonable employee from complaining. *See White*, 548 U.S. at 68. His argument to the contrary is a mere legal conclusion—not competent Rule 56 evidence. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) ("A nonmoving party[] opposing a motion for summary judgment supported by affidavits [and other evidence] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions . . . ."). In any event, Plaintiff cites no caselaw to the contrary, nor indeed any caselaw showing that the adverse actions he suffered would have dissuaded a reasonable employee from complaining. (*See* Dkt. 41 at 19.)[7]

---

[7] This flaw plagues the bulk of Plaintiff's response. In presenting his arguments that Katsov was a proper comparator, that Defendant's reasons for reassigning his tasks were pretextual, that the record evidence presents a convincing mosaic of race and/or gender discrimination, that either gender or race was a motivating factor, and that he suffered an adverse employment action with regard to his retaliation claim, Plaintiff cites caselaw to establish the relevant standard but fails to cite any caselaw to demonstrate that the facts of his case satisfy that standard. (*See* Dkt. 41 at 13–19.) Consider, for example, his argument that Katsov is a proper comparator:

> A "plaintiff asserting an intentional discrimination claim under [*McDonnell Douglas*] must demonstrate that she and her proffered comparators were [']similarly situated in all material respects.'" *Lewis*

Because "[i]t is unlikely that, taking into account all of the alleged incidents individually or collectively, a reasonable employee, standing in [Plaintiff]'s shoes, would have felt dissuaded from filing a complaint of discrimination," Plaintiff's retaliation claim fails as a matter of law. *Rainey*, 412 F. App'x at 238. Thus, the court grants Defendant summary judgment as to Plaintiff's retaliation claim.

## CONCLUSION

Accordingly:

1.  Defendant's Motion to Strike or, in the Alternative, Notice of Objection to Plaintiff's Inadmissible Evidence in His Amended Response (Dkt. 43) is **DENIED**.

2.  Defendant's Motion for Summary Judgment (Dkt. 32) is **GRANTED**.

3.  The Clerk is **DIRECTED** to enter judgment in favor of Defendant, to terminate any other pending motions and deadlines, and to close this case.

---

*v. City of Union City, Georgia*, 918 F.3d 1213, 1218 (11th Cir. 2019). Here, . . . Plaintiff's comparator is Katsov. She is a white female, who worked under the same supervisor, Coleman, within the same department and she was treated more favorably.

(*Id.* at 13.) Such argumentation makes Plaintiff's position generally unpersuasive. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("A passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it."), *overruled in part on other grounds by United States v. Durham*, 795 F.3d 1329, 1331 (11th Cir. 2015) (en banc); *Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions." (internal quotation marks and citation omitted)).

**ORDERED** in Orlando, Florida, on December 3, 2024.

_____
JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record